IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-332-FL

| | |
|---|---|
| DAN CARLSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| TRIANGLE CAPITAL CORPORATION, ) | MEMORANDUM |
| E. ASHTON POOLE, STEVEN C. ) | OPINION |
| LILLY, W. MCCOMB DUNWOODY, ) | |
| MARK M. GAMBILL, BENJAMIN S. ) | |
| GOLDSTEIN, MARK F. MULHERN, ) | |
| SIMON B. RICH, JR., and GARLAND S. ) | |
| TUCKER, III, ) | |
| ) | |
| Defendants. ) | |

This memorandum opinion sets forth reasons for the court's decision entered July 16, 2018, denying plaintiff's motion for preliminary injunction.

## STATEMENT OF THE CASE

Plaintiff filed suit on July 6, 2018, against Triangle Capital Corporation ("Triangle" or "Company") and its board members, alleging violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the sale of all or substantially all of defendant Triangle's assets to Benefit Street Partners L.L.C. ("BSP") for approximately $981.2 million in cash. Triangle stockholders are scheduled to vote on this proposed sale at a special meeting scheduled for July 24, 2018.

Plaintiff's claims concern the Schedule 14A Definitive Proxy Statement ("Proxy") filed by defendants with the Securities Exchange Commission ("SEC") and disseminated to shareholders on June 1, 2018. (See Proxy (DE 12-2)). The Proxy spans more than 500 pages and includes, among other things, a detailed description of the transactions, as well as copies of the Asset Purchase Agreement, the Externalization Agreement, Triangle's 2017 Form 10-K, and Triangle's Q1 2018 Form 10-Q. (See id.). Plaintiff alleges the Proxy contains the following material omissions: 1) indication whether the valuation of defendant Triangle conducted by defendants' financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan"), accounted for the full value of the company; 2) indication whether the terms of the bidding agreements entered into for the sale of the company included "don't-ask, don't-waive" ("DADW") provisions and whether those provisions are still in effect; and 3) certain net asset value information.

On July 11, 2018, 13 days before the July 24, 2018, shareholder vote, plaintiff filed motion for preliminary injunction, seeking to enjoin that vote until defendants disclose to shareholders material information allegedly omitted from the Proxy. The court allowed plaintiff's request for expedited briefing on motion, over defendants' objection, providing defendants until July 13, 2018, to respond, and plaintiff until July 14, 2018, to reply. Plaintiff's motion for hearing, however, was denied at telephonic hearing July 12, 2018, as unlikely to aid in the court's decision, and practically unavailable.

**STATEMENT OF THE FACTS**

Triangle is a specialty finance company that provides customized financing to lower middle market companies located primarily in the United States. (Compl. (DE 1) ¶ 12). Triangle has historically focused on "investments in subordinated debt (or mezzanine) securities, which generally

2

produce higher yields but typically carry higher amounts of principal risk versus senior-oriented securities." (Proxy (DE 12-2) at 57).[1]

On November 1, 2017, Triangle publicly announced that its Board of Directors ("Board") "had elected to pursue the exploration of strategic alternatives, including the potential benefit of partnering with another organization to accelerate the Company's corporate initiatives, the potential sale of certain investments and other alternatives." (Id. at 58). The Board authorized the engagement of Houlihan as financial advisor to assist in that endeavor. (Id.). During subsequent meetings later in November 2017, the Board instructed Houlihan to "contact as many potentially interested parties as practicable without restricting the solicitation process as to type of transaction or counterparty . . . ." (Id.). The Board "approved a form confidentiality agreement to be sent to interested parties," and that agreement "included customary 'standstill' and related provisions designed to protect the strategic transaction review process, along with a provision that would allow bidders to confidentially request a waiver of the standstill provisions once a strategic transaction had been publicly announced, which would allow the Board to receive and consider competing proposals." (Id.).

On December 18, 2017, the Board held telephonic meeting with representatives of Houlihan and Eversheds Sutherland (US) LLP ("Eversheds Sutherland"), Triangle's outside counsel. (Id. at 59). The Board and Eversheds Sutherland "discussed certain provisions in the form confidentiality agreement being negotiated with interested parties, including the standstill provisions and overall term of the confidentiality agreement[.]" (Id.). The Proxy explains: "[T]he Board did not believe

---

[1] For citations to documents identified by docket entry (DE) numbers, page numbers provided are those corresponding to the page numbers specified in the court's electronic case filing (ECF) system and not the page number provided, if any, on the face of the document.

it was in the best interests of the Company or its stockholders to reduce the term of the standstill to less than one year for any single bidder. However, as previously discussed with the Board, under the standard form of confidentiality agreement, following public announcement of a strategic transaction, bidders would be allowed to approach the Board confidentially to seek a waiver of the standstill in order to submit a competing proposal." (Id.).

Eventually, Houlihan informed the Board that over 100 potential bidders were contacted, and 53 bidders executed confidentiality agreements. (Id. at 59-61). "The Company began to receive initial indications of interest on January 17, 2018, including from Barings and BSP on January 18, 2018[.]" (Id. at 60).[2] The initial indications of interest from Barings and BSP are discussed in the Proxy. (Id.). After consideration of the initial indications of interest, Triangle invited numerous parties to participate in the second round of the strategic review process. (Id. at 61-62). Triangle received various second round indications of interest, including from Barings and BSP. (Id. at 62-65). Eventually, after consideration of these additional second round indications of interest, the Board decided to pursue a dual transaction option involving BSP and Barings, and directed Houlihan and Eversheds Sutherland to proceed in negotiations with BSP and Barings accordingly. (Id. at 71).

The parties negotiated a transaction under which Triangle would sell its December 31, 2017 investment portfolio to BSP for $981.2 million, and simultaneously enter into a stock purchase and transaction agreement with Barings, including a payment to Triangle shareholders of $1.78 per share, through which Barings would become investment adviser to the Company. (Id. at 69-76). Following negotiations, the Board "unanimously determined that the Asset Purchase Agreement, the Externalization Agreement and the transactions contemplated thereby were advisable to and in

---

[2] Barings is a wholly owned subsidiary of Massachusetts Mutual Life Insurance Company, a global asset management firm. (Proxy (DE 12-2) at 22).

4

the best interests of the Company and its stockholders and unanimously voted to approve the Asset Purchase Agreement, the Externalization Agreement and the transactions contemplated thereby[.]" (Id. at 76). The Board also recommended "that the Company's stockholders approve the Asset Purchase Agreement, the Stock Issuance and the transactions contemplated thereby, and directed that the relevant matters be submitted to the stockholders for approval and adoption at a meeting of stockholders together with the Board's recommendation that the stockholders approve such matters." (Id.). The total cash consideration in the proposed transaction represents a 26% premium to the April 3, 2018, closing market price of the Company's common stock. (Id. at 77).

On April 4, 2018, Triangle issued a press release announcing the transactions. (Id.). Thereafter, on April 18, 2018, and again on May 17, 2018, Triangle filed preliminary proxy statements with the SEC. On June 1, 2018, Triangle filed the Proxy currently at issue. (Id. at 5). The Proxy invited stockholders to attend a special meeting on July 24, 2018, at which the stockholders would be asked to approve the transactions. (Id.).

Plaintiff owns 200 shares of Triangle stock, (see DE 1-1), which represents 0.0000042% of Triangle's outstanding shares, (DE 40 at 6).

## DISCUSSION

A.  Standard of Review

Rule 65 of the Federal Rules of Civil Procedure allows a court to enter preliminary injunctive relief prior to adjudication on the merits of the action. Fed. R. Civ. P. 65(a). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, plaintiff must establish four requirements: (1) likelihood of

success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in plaintiff's favor; and (4) that an injunction is in the public interest. Id. at 20; see also Real Truth About Obama, Inc. v. Federal Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 130 S. Ct. 2371 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

B. Analysis

1. Likelihood of Success on the Merits

The statutory basis for plaintiff's complaint is Section 14(a) of the Exchange Act, which "makes unlawful the solicitation of a proxy regarding any security, by way of interstate commerce, in contravention of the rules and regulations prescribed" by the SEC. Hayes v. Crown Cent. Petroleum Corp., 78 F. App'x 857, 861 (4th Cir. 2003) (citing 15 U.S.C. § 78n(a)). "SEC Rule 14a-9 prohibits false or misleading statements with respect to material facts as well as the omission of material facts necessary to make the statements therein not false or misleading." Id. (citing 17 C.F.R. § 240.14a-9).

To prevail on a Section 14(a) claim, "a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction." Id. With respect to materiality, "a misrepresentation or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available." Id. (citing TSC Indus., Inc. v.

Northway, Inc., 426 U.S. 438, 449 (1976)).[3]

Moreover, to state a claim for a Section 14(a) violation, the complaint must satisfy the strictures of the PSLRA. The PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Failure to meet these "heightened pleading requirements" results in dismissal of the case. Hayes, 78 F. App'x at 861.

The court addresses each of plaintiff's three allegations of material omissions in turn below.

    a.    Houlihan Valuation – DCF Analysis Inputs

Houlihan performed a discounted cash flow ("DCF") analysis based on company projections, which indicated a value of the company of "$946.4 million to $1,030.4 million." (Proxy (DE 12-2) at 88). The Proxy states the discount rates and terminal value multiples used. (Id. ("Houlihan Lokey applied a range of terminal value multiples of 0.90x to 1.00x, taking into account the results of the selected companies analysis and its experience and professional judgment, to the Company's net asset value and discount rates ranging from 9.0% to 11.0%, taking into account the results of the selected companies analysis and the Company's estimated cost of equity.")). Additionally, the Proxy provides discussion of the financial projections and their underlying assumptions, (see id. at 90-91) and also provides the following summary of company projections:

---

[3] Plaintiff's claim for controlling person liability under Section 20(a) of the Exchange Act must be based upon a primary violation of securities laws; because plaintiff has failed to show likelihood of success as to plaintiff's claim under Section 14(a), he has also failed to establish likelihood of success as to his claim under Section 20(a). See Svezzese v. Duratek, Inc., 67 F. App'x 169, 174 (4th Cir. 2003) ("because Plaintiffs' second claim for controlling person liability under section 20(a) must be based upon a primary violation of the securities laws, that claim fails as well"); In re FAC Realty Sec. Litig., 990 F. Supp. 416, 423 (E.D.N.C. 1997) ("Plaintiff's failure to establish liability of FAC, the would-be 'controlled entity,' under Section 10(b), necessarily dooms the attempt to establish Fleming's and Hodson's liability under Section 20(a)").

7

| $ in millions, except per share figures | Year Ending December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 |
| Total investment income | $109.5 | $120.0 | $128.6 | $138.0 | $146.1 |
| Operating expenses | | | | | |
| Interest and other financing fees | 31.5 | 35.2 | 37.8 | 39.9 | 41.9 |
| Compensation, general and administrative expenses | 21.1 | 22.2 | 22.8 | 23.3 | 23.8 |
| Total operating expenses | 52.6 | 57.4 | 60.6 | 63.1 | 65.7 |
| Net investment income | $ 56.9 | $ 62.6 | $ 68.0 | $ 74.8 | $ 80.4 |
| Net investment income per share | $ 1.19 | $ 1.25 | $ 1.25 | $ 1.28 | $ 1.28 |
| Regular dividends / distributions per share | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 | $ 1.20 |

| $ and share counts in millions, except per share figures | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 |
| Total investments at fair value | $1,222.9 | $1,269.1 | $1,393.3 | $1,536.8 | $1,640.3 |
| Cash and cash equivalents | 41.5 | 129.6 | 115.0 | 82.7 | 82.9 |
| Other assets | 7.2 | 7.2 | 7.4 | 7.5 | 7.6 |
| Total assets | $1,271.6 | $1,405.9 | $1,515.6 | $1,627.0 | $1,730.9 |
| Total debt outstanding(1) | 624.5 | 699.5 | 749.5 | 799.5 | 849.5 |
| Other liabilities | 0.7 | 3.6 | 6.5 | 9.4 | 4.3 |
| Total liabilities | 625.2 | 703.1 | 756.0 | 808.9 | 853.8 |
| Total net assets | 646.4 | 702.8 | 759.6 | 818.1 | 877.0 |
| Total liabilities and net assets | $1,271.6 | $1,405.9 | $1,515.6 | $1,627.0 | $1,730.9 |
| Net asset value per share | $ 13.45 | $ 13.45 | $ 13.45 | $ 13.48 | $ 13.51 |
| Total shares outstanding | 48.1 | 52.3 | 56.5 | 60.7 | 64.9 |

(1) Excludes deferred financings fees, which are included in other assets and other liabilities.

(Id. at 92).

Plaintiff's complaint alleges solely that "the Proxy fails to identify which style of projections were utilized in the analysis, and whether those projections accounted for both Triangle's projected assets and expected revenues." (Compl. (DE 1 ¶ 32). Plaintiff then asserts in his motion for preliminary injunction that the DCF analyses "appears to have only discounted the Company's assets" and not the "Net investment income of approximately $41 million to $83 million in the next five years." (DE 12 at 12). Because of this apparent oversight, plaintiff argues the "Proxy ought

8

to correctly disclose what actual projections were considered in the DCF and thus discounted to reach the value" found. (Id.; see also DE 38 at 4 ("Yet it is not clear which components of the Projections are utilized in the DCF, and what comprises those components . . . whether Projected Net Investment Income was included in Total Net Assets, or whether it should have been.")).[4]

In response, defendants offer the following summary of the relevant analysis:

> In short, although not required to do so, the Proxy provides a clear roadmap for how Houlihan Lokey "reach[ed] the value of Enterprise Value reference range for the Company of $946.4 million to $1,030.4 million." As explicitly disclosed, Houlihan Lokey performed a discounted cash flow analysis not a discounted asset value analysis. Using the Company Projections, Houlihan Lokey applied a disclosed range of discount rates to (1) the Company's projected regular dividends/distributions (the relevant metric in light of the Company's status as [a regulated investment company] and a projection that was fully disclosed as set forth above), and (2) a terminal value calculated by applying a disclosed range of terminal value multiples to the Company's projected net asset value (a projection that was fully disclosed as set forth above).

(DE 40 at 21 (citations omitted);[5] see also Proxy (DE 12-2) at 90 (providing that the company projections, relied on as part of the DCF analysis, "reflect the best available estimates and judgments of the Company's senior management, as of March 1, 2018, as to the <u>future investment incomes and cash flows to be received</u>, and the costs and other expenses to be incurred, as a result of the

---

[4] In his reply in support of his motion to expedite, plaintiff argues for the first time that the disclosures regarding Houlihan's discounted cash flow analysis are insufficient because "'Net Asset Value' is the very basis of the DCF" and the "Projections . . . do not include a line item identified as 'Net Asset Value.'" (DE 38 at 4). As defendants correctly point out, the Proxy discloses the projected "net asset value per share" as well as the "total shares outstanding." (See Proxy (DE 12-2) at 92). "Net Asset Value" can be derived by multiplying these two figures, and arriving at projected Total Net Assets. For example, for the year 2022, the projected net asset value per share is $13.51 and the projected total shares outstanding is 64.9 million. (Id.). Thus, for the year 2022, the Net Asset Value would be approximately $877 million, or the amount of disclosed projected 2022 Total Net Assets. (See id. (reflecting projected "total net assets" of $877 million for the year 2022)).

[5] Defendant argues further that because Triangle is a regulated investment company wherein the company is required to distribute at least 90% of its net investment income to shareholders via dividends, shareholders would understand that the only relevant considerations are the projected net asset value and projected dividends, both which were disclosed. (DE 21 at 20; see also Proxy (DE 12-2) at 307 ("We intend to distribute substantially all of our income to our stockholders.")).

9

Company continuing to operate under its current strategy in current market conditions. . . .") (emphasis added)).

Plaintiff characterizes the above as defendants "reveal[ing] for the first time" that projected regular dividend/distribution are the components of the projections that were discounted as well as that the projected net asset value is the basis for the terminal value. (DE 42 at 6). Plaintiff does not explain how defendants' summary is incorrect or problematic, only insufficiently disclosed in the Proxy, concluding that "[a] 'fair summary' does not involve forcing stockholders to guess which projections were used in a DCF and how they were so used. Defendants imply that this information is fully disclosed, yet for something as important as determining whether a deal is fair, stockholders should not be left to guesswork or assumptions." (Id. at 6).[6]

Plaintiff's characterization is incorrect. Here, the Proxy discloses the chart of company projections, discusses the analysis conducted by Houlihan, including, among other things, summaries of its comparable companies analysis, comparable transaction analysis, and DCF. The information sought by plaintiff is not required, and the Proxy provides a fair summary of Houlihan's valuation. See Malon v. Franklin Fin. Corp., No. 3:14CV671-HEH, 2014 WL 6791611, at *6-7 (E.D. Va. Dec. 2, 2014) ("Courts have consistently held that the duty of disclosure does not extend to the provision of information so extensive and detailed as to permit stockholders to make an independent determination of fair value or recreate the analysis of a financial advisor . . . . shareholders are entitled to no more than a fair summary of the financial advisor's work . . . .

---

[6] Plaintiff additionally argues that "even if the Proxy had disclosed that Houlihan utilized the Company's Dividends in its DCF, which it does not, the Proxy fails to disclose which years of projected Dividends Houlihan utilized as well as the projected Net Asset Value terminal year Houlihan employed to derive the terminal value of the Company." (DE 42 at 6). This wholly new argument is presented in plaintiff's reply to defendants' opposition to plaintiff's motion for preliminary judgment, and the court's holding above applies. See Malon, 2014 WL 6791611, at *6-7; see also Skeen, 750 A.2d at 1174; In re Pure Res., 808 A.2d at 449-50.

Stockholders are not entitled to the extensive financial data necessary to recreate the financial advisor's determination of fair value"); see also Skeen v. Jo-Ann Stores, Inc., 750 A.2d 1170, 1174 (Del. 2000) ("The problem with appellants' argument is that it ignores settled law. Omitted facts are not material simply because they might be helpful. To be actionable, there must be a substantial likelihood that the undisclosed information would significantly alter the total mix of information already provided. The complaint alleges no facts suggesting that the undisclosed information is inconsistent with, or otherwise significantly differs from, the disclosed information."); In re Pure Res., Inc. S'holders Litig., 808 A.2d 421, 449-50 (Del. Ch. 2002) (holding that "stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely" and that "stockholder engaging in the before-the-fact decision whether to tender would find it material to know the basic valuation exercises [undertaken], the key assumptions that they used in performing them, and the range of values that were thereby generated").[7]

In sum, plaintiff has not established likelihood of success on the merits that the Proxy contained material omissions regarding the Houlihan valuation.

      b.      Bidding Agreements – DADW Provisions

Plaintiff also challenges the alleged Proxy omissions concerning the sale process, focusing

---

[7] Plaintiff cites to In re Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171, 203-04 (Del. Ch. 2007) for the proposition that "when a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed." (DE 12 at 13). First, plaintiff has not shown the Proxy fails this standard. Second, in Netsmart, the court granted preliminary injunction, holding in part that the failure of the board to disclose to shareholders the final cash flow projections used by financial advisor in fairness opinion rendered disclosures materially incomplete. Various valuations analyses were disclosed but not the final projections, "which were presented to the Netsmart board on November 18, 2006 in support of William Blair's final fairness opinion, take into account Netsmart's acquisition of CMHC and management's best estimate of the company's future cash flows." Netsmart, 924 A. 2d at 202. Additionally, the proxy did not contain "any charts or revenue or earnings projections," and although the proxy contained other projections, those projections were not "identical to the set of projections used in the fairness opinion." Id.

specifically on disclosures surrounding confidentiality agreements entered into with potential bidders during the strategic review process. (See Compl. (DE 1) ¶¶ 34-36). Plaintiff acknowledges that the Proxy states that confidentiality agreements approved by the Board allowed bidders "to confidentially request a waiver of the standstill provisions once a strategic transaction had been publicly announced[.]" (Id. ¶ 35). In other words, as stated repeatedly in the Proxy:

> The form of confidentiality agreement included customary "standstill" and related provisions designed to protect the strategic transaction review process, along with a provision that would allow bidders to confidentially request a waiver of the standstill provisions once a strategic transaction had been publicly announced, <u>which would allow the Board to receive and consider competing proposals</u>.

(Proxy (DE 12-2) at 58 (emphasis added); id. at 59 ("However, as previously discussed with the Board, under the standard form of confidentiality agreement, following public announcement of a strategic transaction, bidders would be allowed to approach the Board confidentially to seek a waiver of the standstill in order to submit a competing proposal."); id. at 104 ("[u]nder confidentiality agreements entered into during the Company's strategic review process, following public announcement of the Company entering into a strategic transaction, third parties may privately request a waiver of the standstill provisions included in such confidentiality agreements.")).

Notwithstanding, plaintiff argues that because the confidentiality agreements were "subject to negotiation," the Proxy fails to disclose "whether any of the 53 confidentiality agreements Triangle entered into with interested parties were modified and, as a result, included standstill provisions containing a 'don't ask don't waive' provision . . . , and whether that provision had been modified so that it would still fall away upon the execution of the Asset Agreement . . . ." (Compl.

12

(DE 1) ¶ 35).[8]

Plaintiff offers no factual support for the claim that the confidentiality agreements at issue may contain such clauses that could conceivably block post-signing superior proposals, other than what appears to be hypothetical speculation. See In re BioClinica, Inc. Shareholder Litig., No. CV 8272-VCG, 2013 WL 5631233, at *10 (Del. Ch. Oct. 16, 2013) ("The Plaintiffs admit that they have no evidence that the NDAs contained such clauses. Instead, the Plaintiffs argue that 'they are being asked to plead what they cannot possibly know.' Yet no one is 'asking' the Plaintiffs to bring a claim about hypothetical don't-ask-don't-waive clauses. The Plaintiffs have the burden of bringing claims based on actual facts and reasonable inferences, rather than speculation. Obviously no disclosure could, or should attempt to, describe all clauses not included in NDAs, or, for that matter, all breaches of duty the directors have not committed."); Savior Assocs. v. Goncalves, No. 13-60492-CIV, 2013 WL 3026257, at *4 (S.D. Fla. Apr. 8, 2013) ("But again, Savior has not adduced any evidence that Goldman Sachs or Morgan Stanley has such positions or investments, and the law does not require disclosure of facts that do not exist.").

Defendants assert that plaintiff cannot offer any factual support, because the agreements at issue did not contain DADW provisions. (See DE 40 at 16 (citing Decl. of Chairman of Board, E. Ashton Poole (DE 41) ¶ 7 ("These agreements did not include so-called [DADW] provisions that would have prevented bidders from approaching the Board after the public announcement of a strategic transaction to confidentially seek a waiver of the customary standstill agreement in order

---

[8] As defined by plaintiff, a DADW provision "is a term in a confidentiality agreement that prohibits a potential purchaser from making an offer for the company (or its assets) after the merger agreement is signed, and also from even asking the target company to waive the standstill provision so the potential purchaser can make a superior acquisition proposal after the merger agreement is signed." (DE 12 at 14).

to submit a competing proposal.")).[9]

Additionally, the numerous cases cited by plaintiff in no way assist the court in determining the instant motion, or determining whether a claim is stated, where as here there is no indication a DADW term was included in the confidential agreements and where evidence has been submitted stating otherwise, found in both the Proxy and via defendants' declaration.[10]

In sum, plaintiff has not established likelihood of success on the merits that the Proxy contained material omissions regarding the bidding agreements.

      c.      NAV Allegations from Complaint

In his complaint, plaintiff also alleges additional omitted information regarding net asset value ("NAV"), but does not address these allegations in his motion for preliminary injunction. (Compl. (DE 1) ¶¶ 29-31). Specifically, plaintiff alleges that defendants were obligated to disclose "(i) the Net Asset Value Per Share of the Company as of December 31, 2017 . . . ; (ii) an illustrative implied Net Asset Value Per Share of the Company as of December 31, 2017 pro forma for the asset

---

[9] In his reply, plaintiff recognizes that "in their opposition, Defendants reveal for the first time through a declaration submitted with the Opposition that none of the confidentiality agreements entered into by interested bidders throughout the strategic review process include DADW standstill provisions." (DE 42 at 8). However, plaintiff does not thereafter address this declaration.

[10] In In re Ancestry.com, Inc. S'holder Litig., Consol. C.A. No. 7988-CS (De. Ch. Dec. 17, 2012) (transcript of bench ruling), the court granted injunction; however, there, the court had before it an actual DADW provision that had not been disclosed. (See 12-3 at 33). In In re Celera Corp. S'holder Litig., No. CIV.A. 6304-VCP, 2012 WL 1020471, at *21-22 (Del. Ch. Mar. 23, 2012), rev'd in part on other grounds, 59 A.3d 418 (Del. 2012), the court approved class action settlement noting that "the Don't–Ask–Don't–Waive Standstills and No Solicitation Provision are more problematic," and holding only that "Defendants' agreement to waive voluntarily those problematic contractual provisions mooted Plaintiffs' claims in this regard." In In re Complete Genomics, Inc. S'holder Litig., C.A. No. 7888-VCL, Tr. of Telephonic Oral Arg. and the Court's Ruling, at 14-18 (Del Ch. Nov. 27, 2012) (DE 12-4), the partial transcript submitted by plaintiff does not provide the necessary procedural context; notwithstanding, plaintiff cites to the case as only having held that the DADW provision at issue in that case impermissibly limited a board's obligation to disclose material information to its stockholders. See also In Koehler v. NetSpend Holdings Inc., C.A. No. 8373-VCG, 2013 Del. Ch. LEXIS 131 (Del. Ch. May 21, 2013) ("In agreeing to continue the vitality of the DADW provisions of the Standstill Agreements, the Board blinded itself to any potential interest from Private Equity A and Private Equity B"); In re Topps Co. Shareholders Litig., 926 A.2d 58, 92 (Del. Ch. 2007) ("Given that the Topps board has decided to sell the company, and is not using the Standstill Agreement for any apparent legitimate purpose, its refusal to release Upper Deck justifies an injunction.").

14

sale transaction based on the December 31, 2017 NAV … ; and (iii) an illustrative implied Net Asset Value Per Share of the Company as of December 31, 2017 pro forma for the asset sale transaction and the externalization transaction based on the December 31, 2017 NAV ….." (Id. ¶ 29).

It appears that plaintiff has abandoned this claim. To the extent plaintiff has not, the court finds that plaintiff has not established likelihood of success on the merits that the Proxy contained material omissions regarding NAV.

As defendants argue, "[t]o the extent that Plaintiff is still pursing this claim, each piece of information has been disclosed to Triangle's shareholders." (DE 21 at 9). With respect to the December 31, 2017 NAV per share and the December 31, 2017 per share pro forma for the asset sale transaction, both figures were included in the discussion regarding "Effect on the Company if the Asset Sale is Completed." (See Proxy (DE 12-2) at 16 ("The aggregate cash purchase price . . . to be received in connection with the Asset Sale equates to an implied net asset value per share of $12.70 as of December 31, 2017, compared to the closing price of Company Common Stock on December 29, 2017 of $9.49 per share and the Company's reported net asset value per share of $13.43 as of December 31, 2017.")). The December 31, 2017 NAV per share pro forma for the asset sale transaction and the externalization transaction, was included in the discussion regarding "Reasons for the Transaction." (See id. at 77 ("The purchase price to be paid to the Company under the Asset Purchase Agreement and the Stockholder Payment to be paid under the Externalization Agreement to the holders of record of Company Common Stock (other than Barings) represent total value of approximately $13.80 per share as of December 31, 2017 . . . .")).

    2.       Likelihood of Irreparable Harm

Plaintiff argues that "no amount of money can ever compensate a stockholder who has been

deprived of their ability to effectively exercise their corporate suffrage rights." (DE 12 at 16).

Plaintiff cites to numerous cases in support of this proposition, but those cases involved indications of false and misleading information to be submitted for vote, which is not present here. See Lone Star Steakhouse & Saloon, Inc. v. Adams, 148 F. Supp. 2d 1141, 1149-51 (D. Kan. 2001) (holding proxy contains material misrepresentations and that "irreparable injury would occur absent an injunction prohibiting the voting of proxies based upon false and misleading information"); St. Louis Police Ret. Sys. v. Severson, No. 12-CV-5086 YGR, 2012 WL 5270125, at *6 (N.D. Cal. Oct. 23, 2012) (holding proxy contains material misrepresentations and that "disclosure deficiencies cannot be remedied effectively by an 'after-the-fact damages' case" and therefore "it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected") (citations omitted); Gilmartin v. Adobe Res. Corp., C.A. No. 12467, 1992 WL 71510, at *10-13 (Del. Ch. Apr. 6, 1992) (holding proxy contains material misrepresentations and that "[t]he right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages"); Doppelt v. Windstream Holdings, Inc., C.A. No. 10629-VCN, 2016 WL 612929, at *4-7 (Del. Ch. Feb. 5, 2016) (holding proxy contains material misrepresentations and that "[o]nce shareholders have voted without complete and accurate information, it is, by definition, too late to remedy the harm.").

Plaintiff offers no more, and as defendants note, "'[c]onspicuously absent from the record is an affidavit by Plaintiff explaining how the alleged omitted disclosures would inform his vote, that he has personally read the Proxy, and that he has a fundamental understanding of the technical concepts about which he seeks further information.'" (DE 40 at 24 (citing Malon, 2014 WL

6791611, at *10 n.11; see also Parshall, 2017 WL 3130479, at *7 ("Plaintiff has not submitted an affidavit or declaration from himself (or an expert) detailing how the omitted disclosures would inform his vote.")).[11]

Accordingly, the court finds that plaintiff has not established likelihood of irreparable harm.

3. Balance of Equities

Plaintiff argues he "only seeks an order to enjoining the Shareholder Vote until Defendants provide Triangle Capital's shareholders with the material information identified above," and that inconvenience to defendants is minimal, thus the balance of equities weighs in plaintiff's favor. (DE 12 at 17).

Defendants disagree, articulating seven reasons why a preliminary injunction on the eve of the July 24, 2018 stockholder vote would cause substantial harm to Triangle, its shareholders and employees, Barings, and BSP, including expense, lost opportunity, logistical problems, and the possibility the proposed transaction could be jeopardized. (See DE 40 at 26-27 (citing Parshall, 2017 WL 3130479, at *8 (observing a preliminary injunction regarding a stockholder vote of a $66 million dollar merger "has the potential to be enormously disruptive and create public uncertainty regarding the entities involved")).

Whether or not the potential harm to defendants is as significant as argued, plaintiff has not established the balance of equities tips in plaintiff's favor.

---

[11] Moreover, plaintiff waited 13 days before the scheduled vote to move for preliminary injunction, which bolsters the conclusion that plaintiff will not suffer irreparable harm. See Malon, 2014 WL 6791611, at *3 ("Plaintiff's delay in filing his motion seeking a preliminary injunction—fourteen days before the appointed date for the shareholder vote" demonstrated the lack of "haste and dispatch" required of one seeking equitable relief); see also Galaton, 2011 WL 9688271, at *1-2 (denying motion for temporary restraining order or preliminary injunction where the plaintiff waited until 11 days before shareholder vote to seek relief and noting that "[e]quity demands that those who would challenge the legal sufficiency of [a defendant's] decisions … do so with haste and dispatch") (citations omitted); Parshall, 2017 WL 3130479, at *7-8 (denying motion for preliminary injunction where the plaintiff waited until 13 days before shareholder vote to seek relief).

4. Public Interest

Plaintiff has not established issuance of preliminary injunction would be in the public interest. No public interest would be served by the issuance of a preliminary injunction or further disclosures containing information that is either already disclosed or not material on the eve of a long-scheduled stockholder vote. See Stein, 2018 WL 1440841, at *10 ("[T]he public interest would not be furthered by requiring disclosure of the non-material omitted information") (citations omitted).[12]

## CONCLUSION

For the reasons set forth herein, the court denied plaintiff's motion.

This the 23rd day of July, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge

---

[12] In light of this holding, the court does not reach the parties' arguments concerning necessity of bond. (See DE 12 at 19; DE 40 at 28-29; DE 42 at 10).